**Complaint:**

### Background:

1) I was 37 years old in 2008 with sole custody of three minor children ages 10, 5 and 2.

2) Prior to coming to the MGH Cancer Center, I worked happily and successfully as a Grant Manager in Brigham and Women's Neurology Research dept from November 2002-February 2008. BWH is the sister hospital to MGH under the Partners Healthcare umbrella.

3) In February 2008 I was recruited to come to work as a Senior Administrative manager in the MGH Cancer center.

4) Within 5 months, in August 2008, I was transferred to MGH OBGYN with a demotion to Administrative Manager due to budget cuts.

5) Partners healthcare corporation is a nonprofit which had a value over a Billion dollars and showed a $5,000,000 surplus in 2009. **See Exhibit A**

6) I was the Administrative Manager of OBGYN Research at MGH, in good standing and on a successful satisfying career from September 2008 until June 2012.

7) I had a direct dual report role. I reported to both the Executive Director - Caryn Wilson and Chief of Research - Harvard Professor, Jonathan Tilly, Ph.D.

8) The OBGYN Administrative Manager position I was fulfilling was vacated by Mr. Sean Gilligan. He was promoted and transferred to another dept. within MGH because of similar recurring workplace hostility stemming from Chief Tilly, and allowed by the other defendants.Mr. Gilligans testimony is vital to these claims and should be heard.

9) I was optimistic, happy and excelling at my position. I had no sour work relationships with anyone in the MGH organization except for a few flare ups with Dr. Tilly.

**10)** When these various flare ups occurred, I raised my concerns to Caryn Wilson. Each time she told me that the Senior Hospital Executives were sick of Dr. Tillys repeated infractions but because his Research was on the brink of discovery and meant so much for the Hospitals notoriety, they had to 'let things slide".

11) Dr. Dori Woods was a Research Associate who worked very closely with Chief Tilly as a member of his lab. He was her mentor. They took many work related trips together in and out of the country. She was in the process of receiving a promotion to Assistant Professor which he was pushing very hard for.

12) In 2012 Dr. Woods separated from her husband and moved her residence from Massachusetts to within a few miles of Dr. Tilly in New Hampshire.

## Sexual Harassment:

13) I was a victim of Sexual Harassment by Chief Jonathan Tilly , Ph.D. and Dori Woods, Ph.D. on June 19th, 2012. A used pink motorized sex device was placed on my office chair by both of them. I have a picture that was taken by our Admin Asst- Ms. Ashley Cambridge. It is very graphic and I will introduce it at trial.

14) Chief Tilly was the only person with access and the key to get into my locked office.

15) My office # 901 is next to Dr. Tillys #902. When I left, Drs Tilly and Woods were sitting in close proximity (side by side) sharing his small desk in his office. She was working out of his office more than 40% of the time even though she had her own office down the hall. His door was open when I left at 5:30p. I left and locked my door and double checked the handle (as I did every night out of habit).

16) Our offices contain highly confidential information and are to be locked whenever not in use. The only people that have a key to my office are: #1. Environmental services/building mgmt.  #2. Myself. #3. Chief Tilly.

17) At approximately 5:30pm June 19th there were only three people in our locked administrative area. Myself, Chief Tilly and Dr. Woods. When I departed, that left only Chief Tilly and Dr. Woods remaining.

18) Our Administrative assistant - Ms. Ashley Cambridge sat at the reception desk within 5 feet of my office door. She had a clear view into my office. Her testimony is vital to these claims and should be heard.

19) On the morning of June 19th at approximately 8:15a.m.,as I unlocked my office door and entered. Me and Ms. Cambridge observed the device on my office chair. It did not appear to be a new item right out of the package. Based on the appearance, it looked to have been used then placed on my chair. After some distressful alarm and a little panic from both of us, Ms. Cambridge took a picture of it then picked it up with a news paper and placed it in a paper Whole Foods bag which was handed over to Caryn Wilson by Ms. Cambridge.

20) There is no way this act is to be deemed as a humorous joke as the Hospital claimed in the MCAD case.

21) There is no way the act was committed by a lone individual. It had to be collusive. Dr. Woods had the device and Dr. Tilly had the key.

## Hostile Environment:

22) Chief Tilly and Dr. Woods had an inappropriate relationship which was witnessed and noted by several employees. I will prove this with witness testimony.

23) Dr. Woods was being investigated by HR from March 2012 - June 2012 for improper use of authority in the lab. I was not even aware of this until I was interviewed by HR. She had over 15 complaints of Bullying by her co-workers. She used her inappropriate relationship with Dr. Tilly to aggressively order co-workers around. Including me. It was allowed and enforced by Chief Tilly and the rest of the defendants.

24) Chief Tilly divorced his first wife-Kimberly and married his current wife- Jacqueline. At the time of divorce from Kimberly, Jacqueline was a research technician who worked directly for Dr. Tilly at MGH.

25) Mrs. Kimberly Tillys testimony will be vital to these claims and should be heard.

26) After their Marriage, Jacqueline stopped working at MGH but was still receiving a paycheck for several years. I had never met her but saw her salary expense on my monthly reports using her Maiden Name - Jacqueline Canning.

27) When I asked Caryn Wilson about it in 2009, she said it was so they can "funnel money to keep his (Chief Tillys) income lower so his first wife- Kimberly couldn't legally come after him for as much alimony since it was in Jacquelines name". Within 2 months after my calling attention to it Jacqueline was taken off payroll. As far as I know, the money was never returned.

28) It was part of my normal job responsibilities to understand whose salary was hitting the expense reports. Chief Tilly gave me a low performance review citing poor expense reporting. It was his own wifes salary expense that was contributed to the reporting to be unclear.

29) I was deliberately ignored by Chief Tilly for months after the payroll incident. I was ridiculed by Chief Tilly and Dr. Rueda. They would often openly pick on my clothes or my weight. This was witnessed by Both Linda McCormick and Ashley Cambridge. Their testimony will be vital to this claim.

30) In 2010 a sexual harassment claim was filed against Chief Tilly by our administrative assistant at the time - Linda McCormick. I was interviewed as a witness.

31) Ms. McCormick showed me a picture on her phone that Chief Tilly inappropriately sent to her. It showed him in his underwear.

## Retaliation

32) I suffered retaliation by Dr. Tilly on my annual performance review in 2010 for my participation in Ms. McCormicks harassment investigation. I also suffered verbal, emotional and physical intimidation.

33) When the Human Resource results of the sexual harassment charge brought by Linda McCormick in 2010 were to be relayed to Chief Tilly, Chief Schiff directed Caryn Wilson to tell me to stay home and work from home for the week. She stated they weren't sure what his reaction would be and they didn't want me in his vicinity for fear of physical retaliation.

34) After that incident, Chief Schiff gave Linda McCormick a promotion and moved her to another building to keep her from pursuing her sexual harassment claim on Chief Tilly and to protect the OBGYN department. The departments reputation would suffer immensely if it got out that a prominent Doctor in Gynecology was sexually harassing his employees.

### Aiding and Abetting Sexual Harassment

35) Chief Tillys poor behavior has been brought up in the past to President Peter Slavin and SVP Jeff Davis. Every incident was covered up and swept under the rug due to his status and influence with Drs Schiff and Slavin, Jeff Davis and Caryn Wilson and their combined power within the hospital.

36) By using their power and influence, the defendants knowingly and purposefully covered up and overlooked Chief Tilly's ongoing series of malicious incidents. They Aided and Abetted his behavior. Key witness testimony will be vital to this claim and should be heard.

### Constructive Discharge

37) Chief Tilly came into the office very infrequently in the summer. I was able to fulfill my minimal job duties from June 19th until Dr. Tillys return to the office Sept 5th.The culmination of incidents caused me such severe mental anguish and made it impossible to fulfill my job duties once Dr. Tilly was physically present. I took a FMLA from Sept. 6th - November 6th because of the level of stress the harassment and hostile environment caused.

38) Six months elapsed from the time the sex device incident occurred on June 19th through the end of my FMLA Dec. 6th 2012.

39) During that time, I was never contacted by any MGH management or HR to discuss any events causing the adverse work climate. The only communication was facilitated by me on Dec 4th, 2012 to meet with Caryn Wilson to see if there were any changes being made so I could possibly try to return to my position.

40) I received treatment from my personal health care team during my FMLA, Dr. David Judge (Primary Care Physician) and Dr. Stephen Durant (Psychologist) both verbally advised that I could not return to the same unchanged intolerable work place environment. Dr. Judge later documented it with a note. Drs. Judge and Durants testimony of our discussions is vital to this case and should be heard. **See Exhibit B**

**41)** After my FMLA, The Hospital placed me on Workmans Comp. in Dec 2012.

**42)** At that time in December 2012, they retroactively dated my Workmans comp to go into effect Sept 6, 2012 citing: A work place injury.

**43)** MGH sent me to their own Psychiatrists - Dr. Michael Rater, M.D.. He diagnosed me once on 12/28/2012 and then approximately a little over one year later on 2/10/2014. Both his diagnoses stated that the intolerable workplace environment was the predominant major cause of my mental anguish. **See Exhibit C**

44) When I facilitated a meeting with Caryn Wilson on Dec. 4th 2012, my primary question to her was whether I'd still be reporting directly to Dr. Tilly and managing his finances. This situation was the only reason for my becoming ill and corrective action would be absolutely necessary to return.

45) She said I would still report to him and work directly with him. They did not make even one clear accommodation or change. She made one suggestion that I move my office to some offsite location. When I asked her where, she said she didn't have a space and that she'd have to find one.

46) During the Dec 4th conversation with Caryn, she told me to "be proud that you're the one who was going to get Chief Tilly to leave".

47) She said that she was the one who was covering my work load while I was out. She became increasingly frustrated and angry throughout the conversation. Then she leaned forward and said (as she was tilting her head side to side with each syllable)  "put your big boy pants on and get back to work". She said it in such a condescending voice, the way that a parent would chastise an 8 year old.

48) At that point, I feared retaliation from Caryn Wilson as well as previous fears of Chief Tilly and the rest of the defendants. Any reasonable person would have that fear given their combined power and the events leading up to that point.

49) Based on my personal doctors advice, they thought it would be best if I waited until the defendants acknowledged the intolerable work environment and wrong doing and remediated it before I tried to return to my position.

50) President Slavin, Chief Schiff, SVP Jeff Davis, Chief Tilly and Caryn Wilson decided to terminate me in December 2012 and filled my position in February 2013.

**Aftermath**

51) Dr Dori Woods was not fired. She was placed on suspension with pay immediately following the sex device incident in July 2012. I still had access to my online financial tools before I was stripped of access when I was terminated in December 2012. I saw that her salary was still being paid through 2012. I have documentation and will subpoena Hospital payroll records.
.

52) According to Caryn Wilson, Chief Tilly was asked to quietly leave his Chief of OBGYN research position after the sex device incident. He eventually left in April 2014 to go to Northeastern University. **Exhibit D1**

53) Dr. Tillys first hire at Northeastern University was Dr. Dori Woods. **Exhibit D2**

54) I included OVAScience as a defendant in this claim because Chief Tilly is a co-founder. Both Chief Tilly and Dr. Woods were OVAScience employees at the time of the incidents. They conducted OVAScience research on MGH property. OVAScience is liable and currently employ Dr. Tilly as a major share holder and Dr. Woods as a consultant. **See Exhibit E**

## Conclusion

55) Before June 2012 I was physically and mentally healthy and excelling in my career without event.

56) After June 2012, me and my family's lives negatively changed forever. We still haven't recovered.

57) My work environment was so hostile and intolerable such that no reasonable person could work under such egregious and adverse conditions. This environment is a direct result of Chief Tilly and Dr. Woods' inappropriate behavior combined with the rest of the defendants allowing it to continue year after year until they could no longer sweep it under the rug. They have caused real harm to several people. Not just the direct victims but the entire staff who had to endure all the investigations and turmoil they caused every few months for many years.

58) Every single defendant, especially Chief Tilly is directly legally responsible for violating my Civil Rights and my right to enjoy a workplace free from Sexual Harassment, Intimidation, Aiding and Abetting Sexual Harassment, Retaliation and Constructive Dismissal.

59) In the end, the Hospital Senior Management made the deliberate conscious decision to protect the wrong doings of Chief Tilly more than protecting the Civil Rights of their employees.

60) There is no doubt that this can and will be proven at a jury trial.

## Request for Jury Trial

61) Richard G. Stearns is a United States District Judge of the United States District Court for the District of Massachusetts. Judge Sterns is very close personal friends with Drs. Tilly, Schiff and Slavin. Due to the existence of a potential conflict, this case must be heard by a jury. I will not be able to receive a fair trial if my claims are not heard by a jury.

# Exhibit A

**Partners HealthCare System, Inc. and Affiliates**
**Consolidated Balance Sheets**
**September 30, 2010 and 2009**

| (dollars in thousands) | 2010 | 2009 |
|---|---|---|
| **Assets** | | |
| Current assets | | |
| Cash and equivalents | $ 626,919 | $ 561,232 |
| Investments | 1,050,749 | 1,046,894 |
| Collateral held under securities lending arrangements | 129,183 | 183,336 |
| Current portion of investments limited as to use | 1,084,877 | 898,056 |
| Patient accounts receivable, net of allowance for bad debts | | |
| 2010 - $114,425; 2009 - $108,177 | 698,380 | 712,238 |
| Research grants receivable | 132,512 | 133,190 |
| Other current assets | 252,620 | 261,554 |
| Receivable for settlements with third-party payers | 39,472 | 33,330 |
| Total current assets | 4,014,712 | 3,829,830 |
| Investments limited as to use, less current portion | 2,106,023 | 1,857,459 |
| Long-term investments | 838,913 | 829,816 |
| Pledges receivable, net and contributions receivable from trusts, less current portion | 162,839 | 152,956 |
| Property and equipment, net | 3,749,234 | 3,354,069 |
| Other assets | 118,614 | 99,715 |
| Total assets | $ 10,990,335 | $ 10,123,845 |
| **Liabilities and Net Assets** | | |
| Current liabilities | | |
| Current portion of long-term obligations | $ 489,913 | $ 820,620 |
| Accounts payable and accrued expenses | 596,916 | 581,831 |
| Accrued compensation and benefits | 532,410 | 477,325 |
| Collateral due under securities lending arrangements | 129,183 | 183,336 |
| Current portion of accrual for settlements with third-party payers | 34,144 | 22,516 |
| Unexpended funds on research grants | 152,513 | 165,490 |
| Total current liabilities | 1,935,079 | 2,251,118 |
| Other liabilities | | |
| Accrual for settlements with third-party payers, less current portion | 15,453 | 45,093 |
| Accrued professional liability | 70,260 | 64,412 |
| Accrued employee benefits | 977,836 | 979,288 |
| Interest rate swaps liability | 271,402 | 184,032 |
| Accrued other | 216,764 | 201,262 |
| | 1,551,715 | 1,474,087 |
| Long-term obligations, less current portion | 1,977,033 | 1,424,027 |
| Total liabilities | 5,463,827 | 5,149,232 |
| Commitments and contingencies | | |
| Net assets | | |
| Unrestricted | 4,391,191 | 3,845,791 |
| Temporarily restricted | 824,426 | 829,928 |
| Permanently restricted | 310,891 | 298,894 |
| Total net assets | 5,526,508 | 4,974,613 |
| Total liabilities and net assets | $ 10,990,335 | $ 10,123,845 |

The accompanying notes are an integral part of these consolidated financial statements.

2

## Partners HealthCare System, Inc. and Affiliates
### Consolidated Statements of Operations
### Years Ended September 30, 2010 and 2009

| (dollars in thousands) | 2010 | 2009 |
|---|---|---|
| **Operating revenue** | | |
| Net patient service revenue | $ 6,182,451 | $ 5,823,741 |
| Direct academic and research revenue | 1,045,789 | 967,635 |
| Indirect academic and research revenue | 324,583 | 286,846 |
| Other revenue | 572,488 | 536,638 |
| Total operating revenue | 8,125,311 | 7,614,860 |
| **Operating expenses** | | |
| Employee compensation and benefits | 4,427,300 | 4,129,020 |
| Supplies and other expenses | 1,905,160 | 1,827,557 |
| Direct academic and research expenses | 1,045,789 | 967,635 |
| Depreciation and amortization | 356,844 | 328,486 |
| Provision for bad debts | 119,861 | 121,051 |
| Interest | 75,677 | 76,662 |
| Total operating expenses | 7,930,631 | 7,450,411 |
| Income from operations | 194,680 | 164,449 |
| Nonoperating gains (expenses) | | |
| Income (loss) from investments | 109,941 | (25,278) |
| Change in fair value of nonhedging interest rate swaps | (40,690) | (38,955) |
| Gifts and other, net of expenses | (37,985) | (36,229) |
| Academic and research gifts, net of expenses | 42,539 | (18,362) |
| Total nonoperating gains (expenses), net | 73,805 | (118,824) |
| Excess of revenues over expenses | 268,485 | 45,625 |
| Other changes in net assets | | |
| Change in net unrealized appreciation on marketable investments | 58,545 | 93,032 |
| Change in fair value of hedging interest rate swaps | (45,820) | (46,026) |
| Funds utilized for property and equipment | 75,420 | 39,855 |
| Net assets acquired through merger | 193,818 | - |
| Other | 5,412 | 1,618 |
| Change in funded status of defined benefit plans | (10,460) | (778,737) |
| Cumulative effect of change in defined benefit plans measurement date | - | (73,051) |
| Increase (decrease) in unrestricted net assets | $ 545,400 | $ (717,684) |

The accompanying notes are an integral part of these consolidated financial statements.

# Partners HealthCare System, Inc. and Affiliates
## Consolidated Statements of Changes in Net Assets
### Years Ended September 30, 2010 and 2009

| (dollars in thousands) | Unrestricted | Temporarily Restricted | Permanently Restricted | Total |
|---|---|---|---|---|
| **Net assets at October 1, 2008** | $ 4,563,475 | $ 861,910 | $ 301,780 | $ 5,727,165 |
| Increases (decreases) | | | | |
| Income from operations | 164,449 | - | - | 164,449 |
| Loss from investments | (25,278) | (49,173) | (1,080) | (75,531) |
| Gifts and other | (36,229) | (5,606) | 8,284 | (33,551) |
| Academic and research gifts, net of expenses | (18,362) | - | - | (18,362) |
| Change in net unrealized appreciation on marketable investments | 93,032 | 23,203 | (1,506) | 114,729 |
| Change in fair value of interest rate swaps | | | | |
| Nonhedging | (38,955) | - | - | (38,955) |
| Hedging | (46,026) | - | - | (46,026) |
| Funds utilized for property and equipment | 39,855 | (5,595) | - | 34,260 |
| Other | 1,618 | 5,189 | (8,584) | (1,777) |
| Change in funded status of defined benefit plans | (778,737) | - | - | (778,737) |
| Cumulative effect of change in defined benefit plans measurement date | (73,051) | - | - | (73,051) |
| Change in net assets | (717,684) | (31,982) | (2,886) | (752,552) |
| **Net assets at September 30, 2009** | 3,845,791 | 829,928 | 298,894 | 4,974,613 |
| Increases (decreases) | | | | |
| Income from operations | 194,680 | - | - | 194,680 |
| Income from investments | 109,941 | 4,800 | 279 | 115,020 |
| Gifts and other | (37,985) | 23,652 | 14,903 | 570 |
| Academic and research gifts, net of expenses | 42,539 | - | - | 42,539 |
| Change in net unrealized appreciation on marketable investments | 58,545 | 6,372 | 364 | 65,281 |
| Change in fair value of interest rate swaps | | | | |
| Nonhedging | (40,690) | - | - | (40,690) |
| Hedging | (45,820) | - | - | (45,820) |
| Funds utilized for property and equipment | 75,420 | (38,848) | - | 36,572 |
| Net assets acquired through merger | 193,818 | - | - | 193,818 |
| Other | 5,412 | (1,478) | (3,549) | 385 |
| Change in funded status of defined benefit plans | (10,460) | - | - | (10,460) |
| Change in net assets | 545,400 | (5,502) | 11,997 | 551,895 |
| **Net assets at September 30, 2010** | $ 4,391,191 | $ 824,426 | $ 310,891 | $ 5,526,508 |

The accompanying notes are an integral part of these consolidated financial statements.

4

## Partners HealthCare System, Inc. and Affiliates
### Consolidated Statements of Cash Flows
### Years Ended September 30, 2010 and 2009

| (dollars in thousands) | 2010 | 2009 |
|---|---:|---:|
| **Cash flows from operating activities** | | |
| Change in net assets | $    551,895 | $    (752,552) |
| Adjustments to reconcile change in net assets to net cash | | |
| provided by operating activities | | |
| Net assets acquired through merger | (193,818) | - |
| Cumulative effect of change in defined benefit plans measurement date | - | 73,051 |
| Change in funded status of defined benefit plans | 10,460 | 778,737 |
| Loss on refunding of debt | 3,180 | - |
| Change in fair value of interest rate swaps | 86,510 | 84,981 |
| Depreciation and amortization | 356,844 | 328,486 |
| Provision for bad debts | 119,861 | 121,051 |
| Loss on disposal of property | 1,425 | 1,152 |
| Net realized and change in unrealized appreciation on investments | (213,105) | (44,166) |
| Restricted contributions and investment income | (73,471) | (66,181) |
| Increase (decrease) in cash resulting from a change in | | |
| Patient accounts receivable | (106,003) | (90,644) |
| Research grants receivable | 678 | 20,751 |
| Other current assets | 5,297 | (914) |
| Pledges receivable and contributions receivable from trusts | (6,240) | 29,738 |
| Other assets | (14,020) | 883 |
| Accounts payable and accrued expenses | 15,038 | 156,819 |
| Accrued compensation and benefits | 53,972 | 19,854 |
| Settlements with third-party payers | (24,154) | 8,683 |
| Unexpended funds on research grants | (12,977) | (5,522) |
| Accrued employee benefits and other | 10,366 | 16,011 |
| Net cash provided by operating activities | 571,738 | 680,218 |
| **Cash flows from investing activities** | | |
| Purchase of property and equipment | (607,039) | (634,218) |
| Purchase of investments | (482,118) | (1,393,653) |
| Proceeds from sales of investments | 303,800 | 1,347,866 |
| Net cash used for investing activities | (785,357) | (680,005) |
| **Cash flows from financing activities** | | |
| Borrowings under line of credit | - | 50,000 |
| Repayment of borrowings under line of credit | - | (50,000) |
| Payments on long-term obligations | (65,098) | (40,514) |
| Proceeds from long-term obligations, net of financing costs | 504,027 | 227,305 |
| Decrease (increase) in auction rate securities holdings | 20,000 | (50,000) |
| Deposits into refunding trusts | (253,094) | - |
| Restricted contributions and investment income | 73,471 | 66,181 |
| Net cash provided by financing activities | 279,306 | 202,972 |
| Net increase in cash and equivalents | 65,687 | 203,185 |
| Cash and equivalents at beginning of year | 561,232 | 358,047 |
| Cash and equivalents at end of year | $    626,919 | $    561,232 |

The accompanying notes are an integral part of these consolidated financial statements.

# Exhibit B

Exhibit B

 MASSACHUSETTS
GENERAL HOSPITAL

 HARVARD
MEDICAL SCHOOL

Ambulatory Practice of the Future
101 Merrimac Street
Suite 1000
Boston, MA 02114
617-724-1100

11/26/2013

Re: James Quattrucci
    DOB: 8/5/1969

To Whom It May Concern,

Mr. Quattrucci has been unable to work in any capacity since 9/5/2012 due to depression and anxiety related symptoms which were caused by extreme work- related stressors.

Sincerely,

David Judge MD

# Exhibit C

QUATTRUCCI, JAMES
FEBRUARY 24, 2014
PAGE 11

He reported depressed mood, low energy, decreased interest,
increased irritability, sleep disturbance, appetite disturbance,
and passive suicidal ideation. He had had depression prior to
his work situation. He also had a significant intervening event
during this time period which had been the arrest and legal
issues with regard to his ex-wife. In addition, Mr. Quattrucci
represented himself as actively binge drinking over the recent
months.

The prognosis is guarded. His depression has persisted. He has
ongoing stressors related to his work situation and related to
his family issues. He has the continuation of an alcohol use
disorder which has been a problem for him since at least 2006, a
time when he was arrested for a DUI.

Mr. Quattrucci is able to work. He has got the cognitive ability
to work. It is unlikely that he would be able to work at MGH.
Given his affect and the series of events that he described, it
is unlikely that he would be able to adapt to that work
environment and be able to work with other people or persist at
tasks.

I recommend continued treatment for depression including
treatment with cognitive behavioral therapy and supportive
techniques, such as Dr. Durant is using, as well as medication
treatment and any other more intensive treatments that may arise.

I continue to have the opinion I stated in my previous report
that the series of events at Mass General Hospital are the major
cause of his disability rather than personal and family issues.
Mr. Quattrucci did have preexisting issues, and he had subsequent
issues come up over the course of this recent time related to his
ex-wife and criminal charges and the impact this has had on him
and his parenting, and his use of alcohol is causing him mental
health problems at the present time. The events at Mass General
have had an effect on his day-to-day activities and on his
financial well being, as well as being referenced the most
consistently and with the most degree of frequency and intensity
in his mental health treatment records.

He does require additional counseling for the work place stress
and anxiety. Ideally, this would be done in a time limited
manner or in a manner tied in with making progress in terms of

QUATTRUCCI, JAMES
FEBRUARY 24, 2014
PAGE 12

returning to work in some capacity.  A return to work would be
therapeutic for Mr. Quattrucci. Mr. Quattrucci needed to have
alcohol cessation strategies incorporated more actively into his
mental health treatment at the present time, as this can quickly
become the primary problem.

Thank you for the opportunity of evaluating this patient.

I certify that I am a licensed physician in the Commonwealth of
Massachusetts and the above opinions are stated to a reasonable
degree of medical certainty based upon my interview with
Mr. Quattrucci and my review of the records provided to me stated
under the pains and penalties of perjury.

Subscribed and sworn to this 24th day of February in the year
2014 under the pains and penalties of perjury.

Sincerely,

*Michael Rater, M.D.*

Michael Rater, M.D.
Psychiatrist
1792

dcn/IND
T: 02/24/14

# Exhibits D1 & D2

*Please see message below from our new Chair, Dr. Jon Tilly:*

Dear Biology Faculty and Staff,

I am delighted to write this first letter to you to express my excitement and enthusiasm as the new Chair of the Department of Biology. It is an honor, and a tremendous responsibility, to assume this key leadership position, and I truly look forward to working with each and every one of you to assemble, implement and execute a strategic plan for the Department aimed at achieving prominence – both nationally and internationally – in educational, research and service excellence. Building on numerous current strengths already present within the Department, I am confident that we can work effectively together, as well as with other Departments across the COS, the Dean and the Provost, to accomplish this plan. As one might expect, the next few weeks for me will be very hectic as I become better acquainted with the Department, the College of Science and the University as a whole, while simultaneously working to complete the arduous process of transitioning out of Massachusetts General Hospital and Harvard Medical School after more than 18 years of service there. I will make myself available as much as possible during this time if any of you need anything or wish to meet with me, but I also ask for your patience during this transition period. I can always be reached by e-mail, and will try to respond as quickly as I can. While I have already had the opportunity to meet with several of you informally, a priority for me once the new academic year has begun is to ensure that I arrange a time to meet with each of you formally. This will provide me with key information on your current teaching, research and service commitments in the Department, and to discuss future needs as we put a strategic plan in place.

With that said, I would like to mention a few other points, the first of which is that I will be sending out a monthly email to the entire department, highlighting key issues, accomplishments and plans moving forward. Please consider this email as the first of many to come, with the next one scheduled for the end of August (since the end of July is less than 2 weeks away). Open communication among the faculty and staff is key to our success. The remaining points for this month's email are as follows:

Once I am settled, I have an open-door policy in terms of meeting with faculty and staff. Although formal scheduling through Laura is preferred, should a matter arise that needs my immediate attention, please do not hesitate to come see me (or contact me by phone or email if I am not in the office).

I have worked with Wendy Smith closely over the past two weeks in attending to matters of urgency, including two new non-tenure track hires (Academic Specialist and Laboratory Supervisor; see below). I want to take this opportunity to sincerely thank Wendy for her strong stewardship of the Department as Acting Chair, and I hope I can continue to rely on her for guidance and input moving forward.

Two new non-tenure track hires have been approved, and the Search Committees for each have been tentatively identified. Selection of individuals for both of these key teaching positions are critical to accomplish by the middle of August at the latest. My thanks to those faculty members and staff who have graciously offered their time for these two searches with last-minute notice.

A new tenure-track faculty hire will be initiated this fall; Wendy and I are working on the advertisement for the position, which will be placed in Science soon. This first new hire for the Department will be posted as a Cell and Developmental Biologist. Feedback from all faculty regarding Department needs in terms of areas of study for additional new tenure-track hires moving forward will be solicited at our first formal faculty meeting (date and time TBD, but shortly after the start of the new academic year).

Becky Rosengaus is spearheading submission of a National Science Foundation (NSF) Research Experience for Undergraduates (REU) Site Proposal to support research efforts for 10 undergraduate students, who will work in pairs with two collaborating faculty members in Biology and MES. She has asked for potential proposals to be submitted to her by this

Exhibit D2

Friday for evaluation. The deadline for the formal proposal to the NSF isAugust 28. This is a very exciting and worthwhile initiative that I encourage all faculty members to consider participating in. I am working to have two collaborative proposals prepared for her myself — one with Phyllis Strauss on DNA repair processes in early embryos and another with James Monaghan on matrix protein regulation of adult stem cell differentiation.

Dean Gibson and I have worked closely together on this appointment, and I hope all of you welcome Dori with open arms and enthusiasm upon her arrival. Dori has been an instrumental contributor to my research efforts over the past 5 years, and has built her own exciting and independent research program that has already garnered her a substantial external support commitment. In addition to her many gifts as an academic scientist, Dori has worked closely with industry (currently she is the lead for second-line product development at OvaScience) which is of value to the Co-Op program, and she is an outstanding educator. With regard to the latter, our plan is to have her assist Richard Marsh in teaching the Physiology course this fall, and then assume primary oversight of the course upon Rich's retirement this December.

There will be a core facility for tissue processing and histology established in the Department, upon completion of the build-out of my new lab space. Dori Woods will serve as Director of this new key core, and will assist with training as needed for faculty and staff to use this equipment. More details will follow.

I will be systematically evaluating the roles and composition of the various committees established within the Department, and will likely be adding several other committees to ensure our growth and success. One new committee in specific will be an ad-hoc grant review panel that will offer constructive feedback on any proposal that a faculty member plans to submit for funding to an outside agency. I have utilized such a system previously, and it really does have a very positive impact on the strength of the proposals before formal submission. It is better to have your friends and Department colleagues critique your grants first, before Study Section has their shot.

I am sure there are many other items we will need to discuss. For now, this should give each of you an idea of how much I value communication, input from everyone, and teamwork towards achieving common goals.

I look forward to meeting with each of you soon, and to working with all of you to build a Biology Department that is the envy of all others in terms of educational ranking, experiential learning, and research leadership.

Sincerely,

Jon

Jonathan L. Tilly, Ph.D.
Professor and Chair of Biology

# Exhibit E



   

# INVESTORS

*OvaScience is a global fertility company dedicated to improving treatment options for women around the world.*

## OVAS (Common Stock)

| | |
|---|---|
| Price & Exchange | $1.57 NASDAQ |
| Change (%) | ▲ 0.01 (0.64%) |
| Volume | 116,494 |
| 07/03/17 | 4:00 p.m. ET |

*Minimum 20 minute delay*
*Refresh quote*

Investor Overview
Analyst Coverage
Corporate Governance
    Highlights
    Board of Directors
    Management
    Committee Composition
    Governance Guidelines
    Code of Conduct
    Reporting Financial
    Wrongdoing
Stock Information
SEC Filings
News Releases
Presentations
Calendar of Events
Information Request
Investor FAQ
Annual Meeting

Print Page

E-mail Page

# Biography

<< Back

**Jonathan Tilly, Ph.D.**
**Co-Founder**

Fertility expert, Dr. Tilly, is a Co-Founder of OvaScience and Co-Chairman of the company's Scientific Advisory Board. Dr. Tilly joined the faculty of Johns Hopkins University as an Assistant Professor in 1993, and moved to Massachusetts General Hospital (MGH) in 1995 as Associate Professor of Obstetrics, Gynecology and Reproductive Biology at Harvard Medical School (HMS) to direct the newly-created Vincent Center for Reproductive Biology at MGH. He was promoted to Professor of Obstetrics, Gynecology and Reproductive Biology at HMS in 2009. Dr. Tilly's primary area of research is on the development of methods for preserving or reviving fertility and prolonging or restoring ovarian function in young girls and women. These studies have greatly expanded our understanding of such basic processes as menopause, infertility resulting from cancer treatments, and premature ovarian failure caused by exposure to toxic chemicals in the environment. In addition to reporting the first animal model that fails to undergo its equivalent of menopause with age, Dr. Tilly and his associates developed the first therapy that protects ovaries from the ravages of cytotoxic therapies. Recently, Dr. Tilly has taken a much different approach to new methods of fertility preservation and extension of ovarian function based on his discovery of egg precursor cells in the ovaries of adult mice that are capable of generating new eggs. Following publication of this ground-breaking study in Nature in 2004, Dr. Tilly re-focused his entire lab on characterization of oocyte-producing cells to demonstrate that ovarian failure can be reversed through egg precursor cell-based technologies. In addition to this line of work, Dr. Tilly is an authority on how dietary caloric restriction (CR) and CR mimetics can be used to remarkably offset the negative impact of aging on ovarian function and egg quality.

RSS Feeds

E-mail Alerts

Contact IR

Dr. Tilly obtained his Ph.D. in 1990, and then completed postdoctoral training at the University of California-San Diego School of Medicine and Stanford University Medical Center. Dr. Tilly is a member of the National Scientific Advisory Committee of the American Federation for Aging Research and is the recipient of a 10-year MERIT Award from the National Institute on Aging of the National Institutes of Health. His work has been published in 113 original research articles, 20 reviews, 14 editorials, 19 book chapters and two edited books. He is the recipient of three issued patents, including one for his discovery of oocyte-producing cells, and has three other patent applications currently under examination.



| TECHNOLOGY | PEOPLE + CAREERS | ABOUT OVASCIENCE |
|---|---|---|
| SCIENTIFIC INFORMATION | WHY OVASCIENCE | ABOUT US |
| PUBLICATIONS | CAREER OPPORTUNITIES | CONTACT US |

Copyright OvaScience, Inc. The material on this site is for informational purposes only and is not intended to...